# JENKINS v. STATE.
## (No. 738.)

CRIMINAL LAW—HOMICIDE—EVIDENCE—OBJECTION—SUFFICIENCY—CROSS-EXAMINATION—OPINION EVIDENCE—REBUTTAL—MOTIVE FOR CRIME—JURORS—COMPETENCY—FAILURE TO CHALLENGE—CIRCUMSTANTIAL EVIDENCE—MISCONDUCT OF COUNSEL—JURY—VIEW OF PREMISES—INSTRUCTIONS—WITNESSES—BILL OF EXCEPTIONS—AFFIDAVITS—SUFFICIENCY TO SHOW OBJECTION AND EXCEPTION—APPEAL AND ERROR—ASSIGNMENT OF ERROR—SUFFICIENCY—JUDGMENT—FINE AND COSTS IN ADDITION TO DEATH PENALTY—AUTHORITY TO IMPOSE.

1. Since the defendant on trial for murder would not be permitted to impeach himself, nor to introduce a self-serving

statement to support his defense of the act charged, it was
not error, where the coroner had testified for the prosecu-
tion that on the evening of the homicide he had been called
to defendant's house by him, that being the scene of the
homicide, the defendant saying that his wife was dead, to
refuse to permit the defense to inquire of the witness on
cross-examination if he had asked the defendant where he
had been that afternoon; there being no further offer of
proof to show the materiality of the evidence.

2. That the ground of an objection to a question propounded to
a witness is not stated is not alone sufficient to show error
in sustaining the objection, where the materiality of the
evidence called for was not shown by offer of proof or
otherwise.

3. The extent of cross-examination of a witness as to prior
statements, for the purpose of testing his memory, and not
for impeachment, is within the sound discretion of the trial
court, and where, on a trial for murder, the state and de-
fense were agreed that the death of the deceased was
caused by violence, it was not prejudicial error to refuse
to permit further cross-examination by the defense of the
coroner concerning prior statements about what he found
when called to the scene of the crime after several ques-
tions of that nature had been asked and answered.

4. On the trial of defendant for the murder of his wife, where
a witness had testified what the defendant said and did
when he called at her home to inquire for the coroner who
resided there, a ruling sustaining an objection to the ques-
tion propounded to the witness on cross-examination
whether or not defendant's manner was such that he
looked as if he did not know what he was doing, was not
prejudicial, since the witness having already testified to
his appearance and manner, the jury could judge as to his
degree of mentality or distress without the aid of her
opinion.

5. Where a witness, on a trial for murder, in answer to the
question whether he could tell the location of the body
from observing the blood stains on the ceiling in the room
in which the homicide had been committed, stated that,
from the position of the wound upon the body, it would be
necessary for it to be fairly close to the ceiling, the de-
fendant was not in a position to predicate error upon the
overruling of an objection to the question, since it was
preliminary and capable of being answered in the affirma-

tive or negative, and no motion was made to strike the answer as not responsive.

6. Where a witness, on a trial for murder, was asked whether or not the blood stains found upon the ceiling of the room in which the homicide had been committed had struck the ceiling in such a position that they must have gone perpendicularly from the body that produced the spattered blood, and answered that the blood stains were circular, showing that they would strike up instead of being dashed sideways, *held,* that since from the physical condition thus described the conclusion of the jury, if believing the witness, would be the same as that expressed by him, the overruling of an objection to the question and answer as calling for and stating a conclusion was not prejudicial.

7. The sheriff having testified that he examined the house where a homicide was committed, including the cellar windows, and found the sills of such windows covered with dirt which had not been disturbed in any manner, and that it was not possible for any person to have entered the cellar through either of such windows on the day of the homicide, the refusal to strike out the further statement, in answer to the question if any person entered the cellar through these windows, that they had not, while error, was harmless because not prejudicial, since the conclusion of the witness was predicated upon the physical conditions as he had found and detailed them to the jury.

8. A question asked the sheriff whether the defendant, who was on trial for the murder of his wife, made a statement as to when he left home on the day of the homicide, was not objectionable as leading or prejudicial, it being a preliminary question leading up to the material fact, viz: the time when he left the house in the afternoon.

9. A witness having testified that he discovered ashes from burnt clothing in a stove in the house where the homicide was committed, two buttons being found on the top or highest point of the ashes, was asked if it would have been possible for the ashes to have been in the shape they were found if anything had been put in the stove after the article was burned which made the ashes, *held,* that the question was not leading.

10. The defendant, charged with the murder of his wife, having stated to the officers that some clothing which he had worn previous to the homicide had probably been burned up by his wife, *held,* that the ruling sustaining an objection to a question propounded by counsel for the defendant to a

witness in his behalf inquiring if she knew what the deceased and the defendant did with any old clothes while she was an inmate of their home, was not error upon the contention that the defendant proposed to prove by the witness how his wife did dispose of his old clothes, since there was no offer to prove what her custom was in that respect other than that implied, if at all, in the question itself.

11. It was proper to permit a witness for the prosecution, on a trial for murder, to refresh his memory from an extension of a stenographic report as to what defendant said at a certain time and place when the witness was present and heard all that he said, and testified that he saw and read the extension of the notes the day following, when the whole matter was fresh in his memory, and that the notes were the same and correctly and fully set forth what the defendant had said.

12. The admission of evidence in rebuttal, which tends to discredit the defendant's case, which was objected to as not proper rebuttal, was largely in the discretion of the trial court.

13. On the trial of one accused of murdering his wife, evidence of the amount of her property at the time the defendant married her, not long before the homicide, was properly admitted, since it had a 'strong bearing upon and tended to show, in connection with other evidence, a motive on his part for committing the homicide. Evidence admitted as to the source of the wife's property, while immaterial, was not prejudicial.

14. Where a juror fairly states facts which would disqualify him for cause, and a party fails to challenge him on that ground, such party will be deemed to have taken chances and waived his right to thereafter question the qualifications of such juror.

15. In a prosecution for homicide, the evidence being circumstantial, it was not misconduct for the prosecuting attorney to read to the jury as a part of his argument extracts from a celebrated case relating to the reliability and weight of circumstantial evidence.

16. The statute (Comp. Stat. 1910, Sec. 6238), permitting a view by the jury of the place in which any material fact occurred, and providing that the court may order them to be conducted to the place in a body in the charge of the sheriff which shall be shown to them by some disinterested person appointed by the court, and while they are absent no person

other than the sheriff having them in charge and the person appointed to show them the place shall speak to them on any subject connected with the trial, clearly contemplates within the limitations therein expressed, that the sheriff or the person appointed to show the place to the jury may speak to them while engaged in viewing the premises on a subject connected with the trial in order to point out the premises and articles to be viewed.

17. A mere assertion that the sheriff was an interested person and, therefore, improper to be appointed to show the jury the place to be viewed is not sufficient to disqualify him from being appointed for that purpose, without proof offered or received showing such to be the fact.

18. Only a part of the instructions given by the court to the sheriff before the jury were taken to view the premises being in the record, *held,* that, while there was no request to have the instructions reported in full, the part omitted by the reporter in substance at least could have been supplied, and that not having been done, it did not affirmatively appear that substantial error was committed in the instructions given.

19. It is to be presumed that the sheriff and other person appointed by the court to show the jury a place to be viewed, both being under oath to perform their duty, will follow the court's instructions, and *held,* that as against such presumption there was no showing in the case being heard of bias, prejudice, or interest on the part of the sheriff or a violation of the court's instructions.

20. That no person other than the sheriff was appointed to show the jury a place to be viewed by them was not prejudicial in the absence of a showing of misconduct on the part of the sheriff.

21. The statute does not require and it is not necessary that the court stenographer be present during a view by the jury of the premises where a homicide was committed to take down and report all that may be said, since no evidence is given there, and the object of the view is to enable the jury to reach a better and clearer understanding of the evidence given in court and the situation as explained by such evidence.

22. In a prosecution for murder, the defendant being accused of murdering his wife, and the defense being an alibi, circumstantial evidence *held* sufficient to support a verdict convicting the defendant of murder in the first degree.

23. An instruction requested by the defendant requiring proof by the state beyond a reasonable doubt that the defendant was present at the time and place of the alleged murder, where the defense was an alibi, was properly refused, where it was fully covered by other instructions to which there was no objection, and which fairly submitted the question to the jury whether the defendant was present at the time and place of the commission of the homicide.

24. It is unnecessary, where there is evidence tending to prove an alibi, to submit such question to the jury separately and apart from the main question.

25. A verdict in a criminal case must be predicated upon a consideration of all the evidence which is submitted to the jury, and not alone upon that adduced by the defendant, and hence an instruction requested by a defendant is properly refused which states that a reasonable doubt which would justify acquittal might arise from a consideration of all the evidence or from a consideration of that adduced by defendant.

26. Where there was no evidence that an informer, detective, or other person especially employed to hunt up evidence testified in the trial, it was not error to refuse a requested instruction to the effect that greater care should be exercised in weighing the testimony of such a witness than in the case of witnesses who were wholly distinterested.

ON PETITION FOR REHEARING.

27. In signing a bill of exceptions the court or judge certifies that the statements contained in the bill are true and that the objections, rulings and exceptions therein stated occurred on the trial, but he does not certify that the statements contained in an affidavit attached to a motion for a new trial are true or that the matters therein stated occurred on the trial, although the motion with its supporting affidavits are contained in the bill.

28. An affidavit attached to a motion for new trial stating that the affiant was present at the trial and took down in shorthand the testimony and also part of the argument of the prosecuting attorney and that he made a certain statement in argument and read a passage from a law book which was objected to by the defendant's counsel, that the objection was overruled, and that the defendant excepted thereto, is not alone sufficient to show the fact of such objection, ruling and exception.

29. The view of the premises by the jury authorized by the statute (Comp. Stat. 1910, Sec. 6238) is to be made upon

order of the court, but the judge is not required to accompany the jury.

30. A defendant convicted of the crime of murder in the first ·degree was not deprived of his constitutional right or entitled to a new trial because of the fact that the record fails to show whether he was present at a view by the jury. under order of the court, of the place where the crime was committed.

31. The right of a defendant on trial for a felony to be present at a view by the jury of the place where the crime was committed is one which can be waived, and, in the absence of a request by the defendant that he be permitted to accompany the jury, and a denial of the request by the court, the right must be deemed to have been waived.

32. Where one convicted of murder in the first degree was sentenced to suffer the penalty of death as provided by law for that crime, and to pay a fine and the costs of the prosecution, an assignment of error that the judgment imposing sentence is contrary to law does not raise the question of the right of the court to impose the fine and render judgment against the defendant therefor and for costs.

33. While it was not permissible at common law to render judgment for costs against a defendant convicted of a felony, such costs may be taxed when expressly authorized by statute.

34. Within the limits authorized by the statute (Comp. Stat. 1910, · Sec. 6255), providing that the court, in its discretion, may impose a fine of not more than $1,000 as a part of the punishment for a felony, the imposition of the fine is discretionary with the court, and may be imposed upon a defendant convicted of murder in the first degree.

35. The imposition of a fine upon one convicted of murder in the first degree in addition to the death penalty, as authorized by statute, does not amount to cruel or unusual punishment.

[Decided July 29, 1913.]                    (134 Pac. 260.)
[Rehearing denied October 27, 1913.]        (135 Pac. 749.)

ERROR to the District Court, Laramie County; HON. CARROLL H. PARMELEE, Judge.

J. Warren Jenkins was convicted of murder in the first degree upon an informaiton charging that on the 14th day of April, A. D. 1912, at the County of Laramie, in the State of Wyoming, he did feloniously, purposely and with pre-

meditated malice, kill and murder one Jessie Jenkins. The deceased was his wife. A motion for new trial was over-ruled and the defendant brought error.

*William B. Ross* and *Ray E. Lee,* for plaintiff in error.

It was error to refuse to permit the defense on cross-examination of Dr. Beard, the coroner, to inquire whether upon reaching the scene of the homicide, he asked the defendant where he had been that afternoon. The question was objected to without stating any ground, and for that reason alone the objection should have been overruled. (Bundy v. Hyde, 50 N. H. 116; Sigafus v. Porter, 84 Fed. 430; Rush v. French, 25 Pac. 816). It was also error not to permit the defendant to inquire of the coroner as to previous statements made by him with reference to what he had discovered at the scene of the homicide and what the sheriff had said to him there. The witness had been questioned minutely on direct examination as to the conditions at the place of the homicide, and as to his examination of various objects. The questions asked were proper on cross-examination to bring out conflicting statements discrediting the former testimony of the witness and for the purpose of testing his memory of the facts and circumstances as he had previously related them. (2 Wigmore on Ev. sec. 1037 and cases cited; 2 Elliott on Ev. sec. 974 and notes). The question propounded to the witness Stevens by the prosecution whether he could tell the location of the body from which the blood stains on the ceiling came, having been objected to on the ground that it called for a conclusion, should have been excluded. No ground or reason was shown why this witness should be permitted to express his opinion in the matter. The blood stains remained upon the ceiling, and the jury should have been left to form its own conclusion as to the position of the body from which they came. (3 Wigmore on Ev. sec. 918; 1 Elliott on Ev. secs. 671-674; Shafter v. Pillar, 63 Pac. 302; State v. Coella, 36 Pac. 474). Opinion evidence is inadmissible when the facts can be given to the jury from

which a particular inference can be drawn, which is the one to be determined, and concerning which persons of average ordinary intelligence are capable and competent of determining for themselves. For the same reason it was also error to permit the witness to answer the question whether or not the blood stains upon the ceiling struck it in such a position that they must have gone perpendicularly from the body that produced the spattered blood. The refusal of the defendant's motion to strike out the question and the answer, expressing an opinion by the sheriff that no person had entered the house through the cellar was erroneous. It was an easy matter for the witness to describe the condition of the cellar windows so as to allow the jury to draw its own conclusion therefrom. It was not a matter upon which the opinions of witnesses were admissible.

Leading questions when addressed to one's own witness are as a rule improper and an objection thereto should be sustained. (2 Elliott on Ev. sec. 834). Where Mrs. Jenkins obtained the shares of stock which she owned at the time of the homicide was entirely immaterial. A witness was permitted to go into a detailed explanation of the matter which was wholly irrelevant to the issues. It was so obviously immaterial that it should have been rejected, even in the absence of objection. The question was whether the defendant murdered the deceased. The question of the gift of certain property to the deceased by some third party several years prior to the murder was clearly immaterial and its admission improper and erroneous. It was probably proper to show how much and what kind of property the deceased had at the time of her death for the purpose of establishing a motive for the homicide. The question objected to that was propounded to the witness Holland by the prosecution with reference to the possibility of the ashes in the stove to have been in the shape in which they were found if anything had been put in the stove after the articles had been burned which resulted in the ashes was improper and the objection should have been sustained. The

question was leading and called for a conclusion or opinion of the witness with reference to a matter not in issue. (1 Wigmore on Ev. sec. 769; 2 Elliott on Ev. secs. 834, 836). The witness, Norma K. Beard, should have been permitted to answer the question propounded by the defendant's counsel as to whether defendant's manner when he called at her house on the evening of the homicide inquiring for her husband who was a physician and the coroner, was such that he looked as though he did not know what he was doing. (3 Wigmore on Ev. sec. 1974 and notes; 1 Elliott on Ev. secs. 676-678; Horn v. State, 12 Wyo. 80; State v. Brown, 41 Pac. 1042). It is admissible to show whether or not a person is in earnest or his expressions of grief are genuine, and that can be proved only by showing what other persons observed as to his actions. The theory of the prosecution was that the defendant had married the deceased for her money, and that he was continually using his influence over her to get her property into his possession. It was permissible for the defense to rebut this theory by showing that the defendant treated his wife with great consideration, and that he gave her his own money to use in maintaining their home, thus allowing her to save her own money. Evidence to that effect was improperly excluded. It having been intimated by the sheriff during his examination as a witness for the prosecution that someone had broken into the Jenkins house since the homicide, in the interest of the defendant, it was competent for the defense to show the circumstances under which the entering referred to was accomplished to show that nothing improper or unfair had been done in that respect, and it was error for the court to exclude the testimony offered for that purpose. (1 Wigmore on Ev. sec. 15; State v. Speyer, 14 L. R. A. (n. s.) 836).

Objections to several questions asked on the direct examination of defendant's witnesses were sustained on the ground that they were leading. We understand a leading question to be one which suggests the desired answer, and submit that such an objection was in some instances sus-

tained when the question was not leading within that defini-
tion. (Lott v. King, 79 Tex. 292, 59 S. W. 231). It is per-
missible to ask the opinion of a witness whether a person
whose conduct is in question appeared to be anxious. (Wig-
more on Ev. sec. 1794; Elliott on Ev. sec. 676; Horn v.
State, 12 Wyo. 80). The testimony of the witness O'Leary,
who refreshed his recollection from notes of a previous
examination of the defendant made by the stenographer,
but when the defendant was not under oath, was improp-
erly admitted. The testimony was not proper rebuttal. The
witness did not testify from memoranda made by himself.
The original notes were not produced, nor their absence
accounted for. The person who took and transcribed the
notes was not offered as a witness, nor was his absence
accounted for. We believe the rule to be that a transcript
of shorthand notes made by a third person is incompetent
either as evidence or as a writing from which a witness can
refresh his memory, unless the original notes are accounted
for, and when they are accounted for the witness can only
use the transcript for the purpose of refreshing his memory,
but he will not be allowed to read the whole transcript in
evidence. (State v. Maloy, 44 Ia. 104; Shove v. Wiley, 18
Pick. 558; State v. Legg, 53 S. E. 545; Amor v. Stoeckele,
76 Minn. 180; Bank v. Bigelow, 33 So. 704).

The reading of extracts from the published report of
another criminal case by the prosecuting attorney in his argu-
ment constituted prejudicial misconduct. (State v. Jones,
55 S. W. 80; State v. Fitzgerald, 32 S. W. 1113; Ins.
Co. v. Allen, 11 Mich. 501; People v. Anderson, 44 Cal. 65;
Ashworth v. Kittridge, 59 Am. Dec. 178; Tuller v. Talbot,
23 Ill. 357). The aggrieved party is entitled to a new trial
upon showing the disqualification of a juror who has mis-
represented the facts as to his qualification and has been
accepted upon that misrepresentation without knowledge
of the fact that the juror was not qualified to sit in the case.
In such a case a new trial should not be denied unless the
prosecution shows beyond a reasonable doubt that the de-

fendant has received no injury by reason of such misconduct of the juror. (Heasley v. Nichols, 80 Pac. 769; State v. Morgan, 64 Pac. 356; Cody v. State, 3 How. (Miss.) 27; Tarpey v. Madsen, 73 Pac. 411; Dejarnette v. Comm., 75 Va. 867; Chartz v. Terr., 32 Pac. 166; People v. Reese, 2 Pac. 61; People v. Bishop, 73 N. Y. Supp. 226). The misconduct alleged in this case as against two of the jurors is clearly shown by affidavits of witnesses on behalf of the defendant which are uncontradicted except by the affidavits of the jurors in question. When, in a criminal case, the jury is permitted to view the place where the crime was committed, the sheriff is authorized only to accompany the jury to the place, but after they have arrived there it is required that the jury shall be shown the place by some disinterested person appointed by the court for that purpose. (C. S. 1910, Sec. 6238). The objection that some other person than the sheriff is not appointed to show the premises to the jury is not technical. The fact must have been in the mind of the legislature that a sheriff is liable to be interested in the prosecution of criminal cases and the securing of evidence upon which a conviction may be had. We think it further appears from the evidence in this case that the sheriff was prejudiced against the defendant, and not a disinterested person. He should not have been permitted to show the place to the jury.

Instructions "A." and "E." requested by the defendant, with reference to circumstancial evidence should have been given, for they correctly stated the law and covered some phases of the matter not covered by the instructions given. (State v. Aspara, 113 La. 940; The Jane v. U. S., 7 Cranch, 363; Andrews v. State, 42 S. E. 476; Pope v. State, 56 Miss. 790; State v. Fahey, 54 Atl. 690). An instruction requested by the defendant was improperly refused which stated that "circumstances of suspicion, no matter how grave or strong, are not evidence of guilt, and the accused must be acquitted unless the fact of his guilt is proven beyond every reasonable doubt to the exclusion of every reasonable hypothesis

consistent with his innocence." (Henderson v. Comm., 98 Va. 797). No other instruction as to suspicious circumstances was given. The court improperly refused to give the following instruction requested by defendant: The court instructs the jury "that before they can convict the defendant in this case, it must appear from the evidence beyond a reasonable doubt that the defendant and not somebody else committed the offense charged in the indictment. It is not sufficient that the evidence shows that the defendant or somebody else committed the crime, nor that the probabilities are that the defendant and not somebody else committed the crime." The instruction contains a fair statement of the law applicable to this particular case and was approved in the case of Lyons v. People, 68 Ill. 271. Instruction "H." requested by the defendant was also improperly refused. It was given in the Wyoming case of State v. Crocker, showing an approval by the District Court and requires the jury to act cautiously and deliberately in the case of circumstantial evidence, viz: "Under the law, no jury should convict a citizen of crime upon mere suspicion, however strong, or simply because there may be a strong reason to suspect that he is guilty; but before the jury can lawfully convict they must be, by the evidence, convinced of the defendant's guilt beyond all reasonable doubt, and unless so convinced you must acquit the defendant." Instruction "I," taken from the Crocker case, as an instruction meeting with the approval of the District Court, should have been given. Instruction "L." requested by defendant, giving in detail the precautions that should be taken by the jury in dealing with circumstantial evidence, was improperly refused. (Colbert v. State, 125 Wis. 423; Burton v. State, 107 Ala. 108). Also instruction "M." to the effect that in a criminal case resting on circumstantial evidence alone each and every one of the facts necessary to constitute the series of facts leading to the ultimate conclusion of guilt must be established beyond a reasonable doubt. Instruction "N." likewise requested by the defendant requiring that circum-

stantial evidence be acted upon with caution was erroneously rejected. (Comm. v. Webster, 5 Cush. 295; Cook v. State; 28 So. 833; 4 Elliott on Ev. sec. 2709; People v. Fitzgerald, 156 N. Y. 253). The court should have given the requested instruction requiring the exercise of greater care in weighing the testimony of informers, detectives and other persons employed to hunt up evidence against the defendant than in the case of wholly disinterested witnesses. (Frudie v. State, 92 N. W. 320; Fidelity Asso. v. Jeffords, 107 Fed. 402). The officers and detectives who testified for the prosecution in this case had been occupied some time in looking up evidence and were causing every little circumstance to appear as damaging as possible. They magnified and enlarged unimportant and trivial circumstances against the defendant and were inclined to overlook facts that were of vital importance in his favor. It was to them that the defendant made his statements, and they testified from memory as to the exact language of such statements. While it was legitimate and proper for them to secure evidence for the prosecution, still it was likely that they might become prejudiced.

Testimony with regard to verbal statements should be received with great caution, and an instruction to that effect was improperly refused. It was very important in this case, because of the various alleged verbal statements of the defendant introduced in evidence. (People v. McArron, 121 Mich. 41; Burnett v. People, 204 Ill. 25; Dreher v. Fitchburg, 22 Wis. 648; Haven v. Markstrum, 67 Wis. 494; Mullen v. Clark, 49 Ind. 81).

The defendant introduced evidence to prove an alibi, but the court refused to give any instruction covering the law in regard to that defense, and in no instruction in the case is an "alibi" referred to. Instruction "D." requested by defendant covered that matter and should have been given. (This requested instruction is quoted in the opinion). To entitle a defendant to an instruction on the defense of alibi, it is not necessary to prove a perfect alibi, nor to prove it

beyond a reasonable doubt. It is sufficient that evidence has
been introduced tending to prove the alibi. An instruction
upon that defense was very important in this case, since a
conviction was asked solely upon circumstantial evidence.
An alibi is sometimes the only available defense to an inno-
cent man. That is the case here. It was of vital importance
to the defendant, therefore, that the evidence upon the de-
fense of alibi should have been submitted to the jury under
proper instructions. The evidence on that subject does not
merely raise a reasonable doubt of the defendant's guilt,
but we submit that it fully and decisively establishes the
alibi. It is settled law that where there is testimony tend-
ing to establish an alibi a refusal to instruct on the subject
when requested to do so is ground for reversal. (2 Ency.
Law, (2nd Ed.) 54; 12 Cyc. 619; Burton v. State, 107 Ala.
108; Wilkerson v. State, 140 Ala. 165; People v. Morris,
(Cal.) 84 Pac. 466; People v. O'Neil, 59 Cal. 259; Mc-
Namara v. People, 24 Colo. 61; Carcia v. State, 34 Fla. 311;
State v. Hogan, 115 Ia. 457; State v. Porter, 74 Ia. 623;
State v. Lightfoot, 107 Ia, 344; Waters v. People, 172 Ill.
367; Binns v. State, 46 Ind. 311; Fleming v. State, 136 Ind.
149; French v. State, 12 Ind. 670; State v. Johnson (Kan.)
19 Pac. 749; State v. Conway, (Kan.) 40 Pac. 661; Pol-
lard v. State, 53 Miss. 410; State v. Lewis, 69 Mo. 92;
State v. Taylor, 118 Mo. 153; State v. Koplan, 167 Mo. 298;
State v. Fox, 148 Mo. 516; State v. Harvey, 131 Mo. 339;
State v. Kelly, 16 Mo. App. 213; State v. Bond, 191 Mo. 555;
State v. Edwards, 109 Mo. 315; State v. McGinniss, 158 Mo.
105; State v. Jones, 153 Mo. 457; State v. Davis, 186 Mo.
533; State v. Howell, 100 Mo. 628; People v. Stone, 117 N.
Y. 480; McVey v. State, 57 Neb. 471; State v. Waterman,
1 Nev. 543; State v. Byers, 80 N. C. 427; State v. Matthews,
78 N. C. 523; Shoemaker v. Terr'y., 4 Okl. 118; Burns v.
State, 75 O. St. 407; Walters v. State, 39 O. St. 215; Lytle
v. Boyer, 33 O. St. 506; Toler v. State, 16 O. St. 583; Mc-
Grew v. State, 10 Tex. App. 539; Grainger v. State, 11 Tex.
App. 454; Harper v. State, (Tex.) 98 S. W. 839; Rountree

v. State, (Tex.) 55 S. W. 827; Smith v. State, (Tex.) 50 S. W. 362; 7 Tex. App. 359; Ayres v. State, 21 Tex. App. 399; Booth v. State, 4 Tex. App. 202; Wilson v. State, 41 Tex. App. 105; Tijerina v. State, (Tex.) 78 S. W. 913; Arismendes v. State, (Tex.) 60 S. W. 47; Ninnon v. State, 17 Tex. App. 650; Sapp v. State, (Tex.) 77 S. W. 456; Davis v. State, 64 ·Tenn. (5 Baxt.) 612; Wylie v. State, 64 Tenn. (5 Baxt.) 662; Legere v. State, 111 Tenn. 370; State v. Lowery, 42 W. Va. 205).

The evidence is insufficient to warrant the verdict. We think it plain that no consideration was given to the facts favorable to the defendant. ·Every circumstance stated in the testimony supposed to be unfavorable to the defendant could have been true and yet the defendant be innocent of the crime. Much of the testimony consisted of conclusions of officers and detectives, whose judgment and reasoning were biased. Practically all the evidence against the defendant in the last analysis consisted of these two facts: The finding of blood upon his clothing, and the secondary fact that clothing had been burned in the stove the day that Mrs. Jenkins was killed. Evidence as to these two facts was practically limited to the officers and detectives. The defendant clearly established a good reputation for truth and veracity and for being a peaceable and quiet citizen. The evidence failed to show a motive for it appeared that Mrs. Jenkins had offered to turn over to the defendant one half of her property immediately after they were married. There is nothing to show that Mr. Jenkins coveted his wife's property. He was a hard working man, continually employed, and led such a life as to show him not to be a man who would plan and execute a crime of this kind. It was shown that he was not unkind or abusive to the deceased. A witness who had lived in the family testified that the defendant was exceptionally kind to his wife. (See Johnson v. State, 8 Wyo. 494). Then the evidence is conclusive that defendant was absent from the house at the time the crime must have been committed, and it also appears that an un-

known person was seen at the home by one of the witnesses, yet it would appear that these facts were not considered by the jury for they reached their verdict within a very few minutes after retiring for deliberation.

By the sentence of the court a fine was imposed upon the defendant in addition to a judgment for costs. That violated the constitutional provision against the infliction of cruel and unusual punishment. (Art. I, sec. 15).

(By suplemental brief). It is not necessary that proof of alibi should cover the entire time. (State v. Jaynes, 78 N. C. 504; Jordan v. State, 50 Fla. 94; Adams v. State, 28 Fla. 511; State v. Hardin, 46 Ia. 623; State v. Conway, 56 Kan. 682; State v. Taylor, 118 Mo. 153; State v. Spotted Hawk, (Mont.) 55 Pac. 1036; Shoemaker v. Terr'y., 4 Okl. 118; Wisdom v. People, (Colo.) 17 Pac. 519; McAnaly v. State, 74 Ala. 9; State v. Watson, 7 S. C. 66; Payton v. State, 54 Neb. 188; Kaufman v. State, 49 Ind. 248; West v. State, 48 Ind. 483; Adams v. State, 42 Ind. 373; Galloway v. State, 29 Ind. 443; Stewart v. People, 42 Mich. 255; Ford v. State, 101 Tenn. 454; State v. Ardoin, 62 Am. St. Rep. 678; People v. Morris, (Cal.) 84 Pac. 466; Henry v. State, 51 Neb. 149, 66 Am. St. Rep. 455).

On petition for rehearing the following authorities were cited with reference to the alleged misconduct of the prosecuting attorney in reading extracts from law books during the course of his argument: Heller v. Pulitzer Pub. Co., 153 Mo. 205; Hager v. State, 133 Pac. 263; State v. Montgomery, 21 Ann. Cas. 331; R. R. Co. v. Payne, 133 Ky. 539; State v. Fournier, 108 Minn. 402; People v. Welles, 34 Pac. 1078. It was also contended as follows: The trial court erroneously refused to permit a record to be kept by the official stenographer of the statements made to the jury while viewing the premises; the judge refused to go with the jury; and the record fails to show that the defendant was present at the view. A record of the presence of the defendant at the view is necessary. (Lewis v. U. S., 36 L. Ed. 1007). The defendant has a constitutional right to

be present at every stage in the course of the trial and the record must show his presence. (Hopt v. Utah, 110 U. S. 578; Dunn v. Comm. 6 Barr. 384; Ball v. U. S., 140 U. S. 118.) It was error on the part of the court to refuse to appoint some disinterested person other than the sheriff to point out the premises to the jury. The sheriff is not such a disinterested person as the statute contemplates; in fact he was not such disinterested person, but was bitterly prejudiced against the defendant. This was shown before the view of the premises was ordered. It is held by some authorities that the act of viewing premises by the jury is taking evidence, and therefore it is necessary that the judge and other court officials be present. (Foster v. State, 70 Miss. 755; Smith v. Sherwood, 70 N. W. 682). On the other hand, it is held that such procedure is not taking evidence, but that the statute must be strictly followed as to the manner of taking the view and the appointment of persons to conduct the jury to the place. (State v. Lopez, 15 Nev. 407). It would seem that if the view of the premises by the jury is an integral part of the trial the judge should be present. The officer was directed by the court to answer questions of the jury with regard to the premises without giving an opportunity of having such questions and answers taken down and made a part of the record in the case, and this was done over the objection and exception of the defendant. It seems that the instructions to the sheriff by the court were broader than the statute authorizes. Where evidence has been wrongfully admitted or excluded, it is presumed to be prejudicial to the rights of the accused and a new trial should be granted. (Inman Bros. v. Lumber Co., 146 Fed. 449; McGivern v. Steele, 83 N. E. 405; Florence W. Works v. Trinidad &c. Co., 40 So. 49; Gherky v. Tel. Co. 107 N. Y. Supp. 420; Ins. Co. v. Wagner, 109 S. W. 1120; Fountain v. R. R. Co., 114 Mo. App. 683; Ry. Co. v. Courtney, 92 S. W. 251; Ry. Co. v. Campbell, 96 Pac. 986; Howe v. Frith, 95 Pac. 603; Short v. Frink, 90 Pac. 200). This court having found that evidence was erroneously rejected

and other evidence erroneously admitted, it seems to us in
a case of this kind that the general rule presuming prejudice
applies with particular force.   On the question of the dis-
qualification of the two jurors two cases which had not
been decided when the original briefs were prepared have
come to counsel's attention and are here cited, sustaining
the point that said jurors were disqualified to sit in the
case, viz: Hager v. State, 133 Pac. 263, and Tegler v. State,
130 Pac. 1164.

*D. A. Preston,* Attorney General, for the State, (*C. L.
Rigdon* of counsel).

When it appears to the appellate court that a question pro-
pounded to a witness was clearly inadmissible, the ruling re-
jecting it will be sustained although no ground of objection
was stated.   But when an objection is overrruled the object-
ing party cannot be heard to complain if he has not pointed
out the specific ground of his objection.   Foundation for
impeachment cannot be laid as to irrelevant or immaterial
matters.   It is not error to refuse to permit cross-examina-
tion as to a conversation which was not gone into on direct
examination.   (Bratt v. State, 41 S. W. 624; Gains v. State,
42 S. W. 385; State v. Coats, (Wash.) 61 Pac. 726; And-
rews v. State, (Ala.) 32 So. 665; People v. McArron, 121
Mich. 1).   The witness Beard had not testified on direct
examination to any statement, word or act of the defendant,
and hence the cross-examination of that witness with respect
to statements and conduct of the defendant was improper and
inadmissible, because in the nature of self-serving declara-
tions; that which was sought to be brought out by the cross-
examination was a matter of defense.   (3 Enc. Ev. 818B;
Thornton v. Hook, 36 Cal. 223; State v. Coats, *supra.*)
Opinions of ordinary witnesses derived from observations
are admissible in evidence, when, from the nature of the in-
vestigation, the facts cannot be so detailed to the jury that
they can draw the proper inferences therefrom and form an
intelligent judgment.   (1 Elliott on Ev. Secs. 675-679, 682,
686; Comm. v. Sturtivant, 19 Am. Rep. 401)   Judgment

founded on actual observation is knowledge and fact. (Wigmore on Ev., sec. 919, 1928). The mere suggestion of a subject does not make a question leading. Leading questions may be permitted in the discretion of the court. (Kemmerer v. Edelmour, 23 Pa. St. 143; McKeown v. Harvey, 40 Mich. 226; 2 Elliott on Ev., secs. 836, 840, 842, 843). It was proper for the State to show the value of the property owned and possessed by the deceased at the time of her death as bearing on the motive. (Davidson v. State, 135 Ind. 254). It was also proper to show that the contract between the deceased and Leffingwell was such as to indicate no motive on the part of the latter to commit the crime. Circumstantial evidence should be allowed a wide range, for while there must be some connection between the fact to be proven and the circumstances offered in support of it, yet any fact necessary to show a motive for the commission of the crime may be proved. Anything, therefore, which had a bearing upon the defendant's efforts to secure the property of the deceased was material. (21 Ency. Law, 214; People v. Buchanan, 145 N. Y. 1). Evidence which is relevant as tending directly to prove a fact in issue is not incompetent or immaterial merely because of its remoteness in point of time. Whether the time is or is not too remote is largely a question for the trial court. (12 Cyc. 390; Sunter v. Sunter, 190 Mass. 449; Keener v. State, 68 Am. Dec. 269; State v. Perigo, (Ia.) 28 N. W. 452). Evidence cannot be rejected as incompetent because weak and inconclusive. (12 Cyc. 390; Cornish v. Terr., 3 Wyo. 93). Refusal to permit a question is immaterial if a question of the same import is afterwards allowed. (People v. Pearson, 50 Mich. 233).

The admission of the testimony of the witness O'Leary by referring to a transcript of stenographic notes of what was said by the defendant when he was present was proper, since the witness testified that he knew the transcript to be true, and this was sufficient to permit the introduction of the testimony and also of the memorandum referred to. (1

Greenleaf on Ev. (16th Ed.) 439B; 1 Wigmore on Ev. sec. 754; Moots v. State, 21 O. St. 653; Howard v. McDonough, 77 N. Y. 592; Mason v. Phelps, 48 Mich. 126; Bryan v. Moring, 94 N. C. 687; State v. Legg, 53 S. E. 545). The questions and answers testified to by the witness were called to the attention of the defendant on cross-examination and he was asked if such questions were asked him and if he made such answers. Proper foundation was therefore laid. (31 Ark. 684; 15 Ency. Pl. & Pr., 394; Horn v. State, 12 Wyo. 80, 73 Pac. 705). The prosecuting attorney did not, during his argument, read from a law book nor state to the jury that he was reading from such a book. The statement complained of was called forth in reply to argument of defendant's counsel in which said counsel read at great length from law books and reports, both the facts and opinions of judges in cases involving circumstantial evidence. The statement of the prosecuting attorney was limited to repeating what someone had said as to circumstantial evidence. Hence counsel for defendant is not now in a position to complain of that matter. (12 Cyc. 582; Buck v. Terr., 98 Pac. 1017). No motion to strike out the remark complained of was made by the defendant and no request was made that the jury be instructed to disregard such statement. A statement made in argument though improper is not ground for new trial where there was a mere objection to the statement, since the fact could have been removed by asking that the jury be instructed to disregard it. (12 Cyc. 584; People v. Shears, 133 Cal. 154; State v. O'Keefe, 23 Nev. 127, 43 Pac. 918; State v. Regan, 8 Wash. 506, 36 Pac. 472; Comm. v. Tripp, 157 Mass. 514). The trial court, in overruling the motion for new trial, found that the two jurors complained of were not biased or prejudiced, but were fair and impartial. No challenge for cause was interposed to either juror, and the defendant's peremptory challenges were not exhausted. (Schrader v. State, 36 So. 385; Louder v. State, 79 S. W. 552; Black v. Terr., 3 Wyo. 313, 22 Pac. 1090). The jurors emphatically denied making the statements alleged in the

affidavits charging their disqualification, and both answered fairly and fully as to any opinion which had been formed or expressed when examined as to their qualification. They made no false statements when being so examined.

It does not appear in the record that the sheriff pointed out to the jury when viewing the premises any of the objects therein or made any statements to them about any object concerning which the witnesses had testified, nor does the record show or indicate that anyone made a statement or suggestion in the presence of the jury while they were viewing the premises. The sheriff was a disinterested person and could properly be appointed to show the premises to the jury. No complaint of misconduct on his part was made at the time of the view, nor was any motion made to strike out anything said by anyone during the view, nor any attempt to show that anything prejudicial to the defendant had occurred. (People v. Fitzgerald, 70 Pac. 554).

Instruction "A." requested by defendant was argumentative, and every statement of law contained in it was covered by the instructions given. Instruction "B." was properly refused: first, because there was no evidence upon which to base it, no informers, detectives or other persons especially employed to hunt up evidence having testified in the case. Second, because the instruction invaded the province of the jury. In jurisdictions where such an instruction is permitted, the giving of it is based upon rules of practice rather than law and rests largely in the discretion of the trial court. (Copeland v. State, 36 Tex. Cr. 575; O'Grady v. People, 95 Pac. 346; Comm. v. Ingersoll, 145 Mass. 231; Comm. v. Mason, 135 Mass. 555; State v. Block, 121 N. C. 578; Hronek v. People, 134 Ill. 139). Instruction "C." requested by defendant invaded the province of the jury. Its refusal, even if error, would not justify reversal, for it states a mere common-place matter within the general knowledge of the jury. (Goss v. Steiger, (Cal.) 82 Pac. 681; Kaufman v. Meyer, (Cal.) 29 Pac. 481; Mauro v. Platte, 62 Ill., 450; Comm. v. Galligan, 113 Mass. 202). The other instructions

that were requested, the refusal of which is assigned as error, were all fully covered by the instructions given, so far as they contain correct statements of the law. The requested instruction "M." was properly refused because not correctly stating the law. Circumstantial evidence does not, as a matter of law, necessarily consist of links. There may be and are cases where a single circumstance will justify a finding of the existence of an inferential fact. (Tomkins v. State, 32 Ala. 569; State v. Shines, 125 N. C. 730; Dressler v. People, 117 Ill. 422; State v. Young, 9 S. D. 165; Grant v. State, 11 So. 915). Requested instruction "N." did not state the law correctly, and, moreover, it was argumentative in form and invaded the province of the jury. (State v. Horn, 12 Wyo. 80).

There was no error in refusing instruction "D." requested by defendant upon the subject of alibi. The subject is fully covered by the instructions given, especially by those numbered 12, 13 and 14. But if the requested instruction be construed to be one covering the subject of alibi, it was not justified by the evidence. Where there is no evidence to support an alibi an instruction on the subject is unnecessary. The alibi attempted to be proven was not inconsistent with the theory of guilt, and therefore a separate instruction on the subject was not warranted. (Williams v. State, 128 S. W. 1120; Underwood v. State, 117 S. W. 809; Parker v. State, 49 S. W. 80; State v. Reed, 17 N. W. 150; Jones v. State, 110 S. W. 80; Phillips v. State, 121 S. W. 1110; Cook v. Terr'y., 3 Wyo. 110; State v. Jackson, 95 Mo. 623; State v. Seymour, 94 Ia. 699). If it be conceded that the defense was alibi and that there was evidence tending to support it, an instruction especially referring to that defense was not necessary. (State v. Schroyer, 24 Am. St. Rep. 344; State v. Cameron, 40 Vt. 555; State v. Ward, 61 Vt. 153). Where the question of personal identity and alibi are both in issue a special instruction on alibi is not required. The instruction as offered was an erroneous statement of the law. Where there is circumstantial evi-

dence tending to show defendant's guilt and also evidence tending to prove an alibi and defendant's good character, it is not error to refuse an instruction that if the jury believe the evidence of the defense they will find the defendant not guilty, for it limits the jury to a consideration of the defendant's evidence only. (Grant v. State, (Ala.) 11 So. 915). It is never proper by an instruction to single out a part and ignore other evidence given in the case which should be considered with it, for such action gives undue prominence to the part mentioned, while drawing the attention of the jury away from other facts which may be of equal weight and importance. (Davis v. State, (Ala.) 51 So. 239; Mullins v. People, 110 Ill. 42; State v. Worthen, 124 Ia. 408; State v. Standley, 76 Ia. 215; Carleton v. People, 150 Ill. 181; Flanagan v. People, 214 Ill. 170; Tais v. Terr'y., 94 Pac. 947; Wilburn v. Terr'y., 62 Pac. 968; State v. Spotted Hawk, 55 Pac. 1026; State v. Powers, (Vt.) 47 Atl. 831; State v. Josey, 64 N. C. 56). The court is not bound to instruct on a proposition of law unless a proper instruction containing a correct statement of the law is offered. (Starke v. State, 17 Wyo. 55; Santolini v. State, 6 Wyo. 110). Even if. the instruction requested contained a correct statement of the law it would not have been error to refuse it, for it contained nothing but common-place matter and matter of fact within the common knowledge of ordinarily intelligent persons. (Smith v. State, 17 Wyo. 481). It is not error to refuse an instruction on reasonable doubt applied to a particular line of defense. (Smith v. State, *supra;* Dotson v. State, (Ga.) 59 S. E. 774; McDuffie v. State, 90 Ga. 786).

The sufficiency of the evidence is beyond question. The accused was defended by able counsel, and his rights were scrupulously protected throughout the trial.

Scott, Chief Justice.

The plaintiff in error was charged, tried and found guilty of murder in the first degree. Motion for a new trial was

made and overruled, judgment pronounced against him
upon the verdict and he brings error.

1.   The coroner testified as a witness on behalf of the
state that on the evening of April 14, 1912, he was called
to defendant's dwelling house by the defendant, that being
the scene of the homicide, the defendant saying that his
wife was dead.   The following question was propounded
to him on cross-examination, viz: "Did you ask Mr. Jen-
kins (the defendant) that night immediately after you
reached the scene where he had been that afternoon?
Plaintiff objects to that.   Objection sustained.   Defendant
excepts."   There was no further offer of proof and nothing
to indicate the materiality of this evidence.   The witness
had not been interrogated as to this matter on direct exam-
ination, and the question propounded was not proper cross-
examination.   Defendant would not be permitted to im-
peach himself nor would he be permitted to introduce a
self serving statement to support his defense of the act
charged.   That the ground of the objection was not stated
could not avail defendant unless he made it clear by offer
of proof or otherwise that such evidence was material, and
having failed to do so there is no affirmative showing of
prejudicial error in that particular.

Objection was made to the court's refusal to permit the
defendant to cross-examine Dr. Beard as follows: "Then
you stated on a little further (referring to a typewritten
statement made by the Doctor shortly after the homicide)
right after what I have read.   'Later, however, Roach
claims to have found, I think, a towel hid some place, but
I am not sure whether that was the clothing they gave
me to examine or not, I think it was.   There was just a
few stains of blood on it, not sufficient to have made a test
of, however, just little stains.'   State whether or not you
made that statement to me."   The object or purpose of this
cross-examination was not apparent other than to test the
memory of the witness.   From the record it was not
for impeachment.   The extent of such cross-examination

was within the sound discretion of the trial court and in view of the fact that both the State and defense were agreed that deceased came to her death by violence we can see no prejudicial error in the court's refusal to permit the defendant to further pursue this line of cross-examination. Other objections of like nature were interposed and sustained to questions propounded to this witness as to what defendant said and did at the time but the conclusion reached and for the same reasons the assignments need not be further noticed.

2. Norma K. Beard testified as to how defendant looked, acted, what he said and did when he called at her home to get the doctor on the night of the homicide. The defendant inquired of her as follows: "State whether or not his manner was such that he looked as if he did not know what he was doing? Plaintiff objects to this question. Objection sustained. Defendant excepts." This ruling was not prejudicial for the witness had already testified to his appearance and manner and the jury could judge as to his degree of mentality or distress without the aid of her opinion upon that subject.

3. Objection upon the ground that the question called for a conclusion was interposed and overruled to the question propounded by the state to the witness Stevens, viz: "Could you tell the location of the body from which they (meaning the blood stains on the ceiling) came?" To this question the witness answered: "Why, from the position of the wound upon the body it would be necessary for the body to be fairly close to the ceiling to get that blood up on the ceiling." The first question was a preliminary question and could have been answered by "yes" or "no" and there was no motion to strike the answer as not responsive to the question. The defendant is not in position to predicate error upon this assignment. On the same ground as the foregoing question objection was made to the following question and answer of the same witness, viz: "I will ask you whether or not the blood stains upon the ceiling struck

the ceiling in such a position that they must have gone perpendicularly from the body that produced the spattered blood." Answer: "The blood stains were circular, showing that they would strike up instead of being dashed sideways." The physical condition was thus described and from such description the conclusion to the mind of a juror, if they believed the witness at all, would be irresistibly the same as that expressed by the witness. (State v. Passeo, 19 Wyo. 344). We see no prejudicial error in the court's ruling.

4. The sheriff of Laramie county was sworn and testified as a witness on behalf of the state that he made an examination of the premises where the homicide was committed as follows:

"Q. Did you make an examination of the cellar?

A. I did.

Q. What examination did you make of the cellar?

A. I went down the steps and hunted every place I could for blood stains or for foot prints.

Q. Were there any blood stains in the cellar?

A. No, sir.

Q. How is this cellar constructed?

A. It does not—. It is not a cellar all the way under the house, but the ground is dug down a few feet from the bottom of the floor in part of the cellar, but not enough so one could walk in it, just a small space where you can walk around.

Q. Did you examine all the openings to this cellar?

A. Yes, sir.

Q. What openings are there to the cellar?

A. There is some windows between the ground and the floor.

Q. Did you examine these windows?

A. I did.

Q. And what did you find the condition of the windows to be?

A. They were covered with dirt and leaves.

Q.   What was the condition on the inside of the cellar of the window?

A.   The inside was covered with dirt.

Q.   Had this dirt—where was this dirt?

A.   It was upon the window sill.

Q.   Had this dirt upon the window sill been disturbed in any manner?

A.   No, sir, it had not.

Q.   Was it possible for any person to have entered the cellar through either of these windows on that day?

A.   No, sir.

Q.   Had any person entered the cellar through these windows?

A.   They had not.

Q.   What further examination—

Defendant moves to strike that out because that is a conclusion of the witness. Motion denied. Defendant excepts.

Q.   what further examination did you make of this cellar?

A.   I looked behind the steps leading down from the pantry into the basement and all around the cellar between the ground and the floor where it was not deep enough for one to walk around.

Q.   How did you make that examination?

A.   I turned on the electric light and used the flash light.

Q.   Did you make a minute examination of all the ground underneath the building?

A.   I did.

Q.   Where it was cellar and where it wasn't?

A.   Yes, sir."

The defendant assigns as error the refusal of the court to sustain his motion to strike. The motion is indefinite and uncertain and aside from that the witness testified as to the physical conditions as he had found them and his answer to the question as to whether any one had entered the cellar through these windows was predicated upon the

physical conditions as he had found them and had there-tofore detailed to the jury. While the ruling was error we do not think it prejudicial but at most harmless error. The sheriff also testified to a conversation with the defendant the night after the homicide, which was supposed to have been committed during the afternoon of that day. The state was permitted to ask the witness the following question over defendant's objection that it was leading, viz: "Q. At that time did he make a statement as to the time when he left the house on that afternoon?" and to which the witness answered: "He did." The question was preliminary and leading up to the material fact, viz: the time when he left the house in the afternoon. We see no prejudicial error in the ruling of the court in this respect.

5.   Thomas E. Holland was sworn and testified as a witness on behalf of the state that at about 5:30 a. m. of the morning following the homicide he, in company with the sheriff and Chief of Police, went to the Jenkins' home and made an examination of the house and its contents at that time, and that they first examined the stove. Upon inquiry and during his examination in chief he said: "I noticed the specks of blood about the room and over the stove, and the charred specks where the greatest heat of the stove had been, and looked in the stove. The highest point in the stove was two buttons. Q. Where was these buttons? A. It was a round oak stove with a sort of a hump grate in it with a hole about two inches in diameter. Right on the highest point in that stove was two buttons. There was one full button and one about three quarters, sort of a crescent shape.

Q.   What were these buttons resting on?

A.   They were on the highest point in the stove on the cinders, the ashes.

Q.   What kind of ashes were they?

A.   They resembled burnt cloth.

Q.   Did you examine to see whether they were burnt cloth or what they were?

A.   Not at that time.

Q.   Did you examine them later on to determine whether they were cloth or not?

A.   Yes, sir.

Q.   Had anything been put in the stove after these ashes had been burned there?

A.   I would say that cloth was the last thing burnt in the stove.

Q.   Would it have been possible for these ashes to have been in the shape they were in this stove if anything had been put in there after the article which was burned which made these ashes was burned?

Defendant objects to that as a leading question. Objection overruled. Defendant excepts.

A.   No, sir. No, sir, they couldn't have been anything else burnt in the stove after the clothing.

Q.   Now you say you didn't disturb this at this time?

A.   No, sir.

Q.   Then what did you do?

A.   Went from room to room, and from cellar to garret and examined everything very carefully, looking for evidence of the crime to see if we could find any of the clothing that had been worn by the one committing the deed.

Q.   Did you make any further examination of the articles in the dining room?

A.   Why, there was a brown coat hung on the chair near the kitchen door. I seen blood specks on that.

Q.   Did you examine any other articles in this dining room?

A.   Well, there was a pair of broken glasses lying there on the floor, I believe, or possibly had been picked up and laid on the table.

Q.   Did you examine any other articles in the room?

A.   Examined the writing desk, and two boxes of stationery lay on the top of the desk as it had opened down. I examined that to see if the desk was opened or closed at the time the crime was committed, and I found blood spat-

tered on the under side of the desk, showing it had been closed at the time the deed was committed.

Q. Did you make any examination of the Indian clubs in this room?

A. Yes.

Q. What was the result of that examination?

A. One of the Indian clubs was spattered with blood, and the other had very little indications of blood upon it. Mr. Stevens took the Indian club and held it up to the light in this manner (witness indicating), between him and the light and picked off a hair about two inches in length.

Q. What was done with that hair?

A. That was given to Mr. Schoels and he put it in his watch case the last time I ever seen it.

Q. Where was the blood that was upon the Indian club that you found the hair on?

A. As I remember it there was two or three small spots at the base of the club, and there was one spot like a clot of blood up near the end of the handle, right at the ball part.

Q. Did you examine that club carefully yourself?

A. Yes, sir.

Q. Were you there at any time that morning when Jenkins was brought to the house?

A. Yes, sir, I was there.

Q. Who brought him over there?

A. Sheriff Roach.

Q. Where did he take him?

A. He took him through the kitchen into the bath room and searched through there for clothing.

Q. What clothing?

A. Why, for Mr. Jenkins' underwear.

Q. What induced you to hunt for Jenkins' underwear?

A. I suspected him of the crime.

Q. What hunt did you make for the underwear; that is, did Jenkins make?

A. He put in about fifteen minutes in the bed room and closet going through a couple of laundry sacks that were

there and turning over the various articles that had been scattered on the floor.

Q.  Did he find the underclothing?

A.  He did not.

Q.  What conversation took place with respect to the underclothing?

A.  Why, Sheriff Roach asked him where the clothing was he took off the night before, or the day before rather, and he said.————. He looked around and he finally got over in the corner where there is another little closet in the southwest corner of the room there, and picked up an olive drab government shirt and brown trousers and said: Here is the clothing that I took off.

Q.  What other conversation took place respecting the clothing?

A.  Sheriff Roach asked him where his underclothing was, or asked him if he didn't wear underclothing, something to that effect. Then he made a further search and couldn't find them, and he said, I guess she must have burnt them up, they were uncomfortable and I was complaining of them.

Q.  What other conversation took place about them?

A.  About that time Sheriff Roach asked him if he knew that they were burned up, or knew what became of them, something to that effect. He said she must have done something with them or they would be there somewhere.  ·

Q.  What else did he say about the clothing?

A.  I don't recall anything else just now.

Q.  Would you know those pants if you should see them?

A.  Yes, sir.

Q.  I will ask you if these are the trousers?

A.  Yes, sir, brown pants covered with specks.

Q.  You examined them that night did you to determine whether they are the ones or not?

A.  Yes, sir, we examined them."

The question as to the possibility of the ashes to have been in the shape they were in if anything had been put in

the stove after the article was burned which made the ashes called for answer of yes or no and was not for that reason suggestive of the answer desired. Mrs. Walker, a witness for the defendant, having testified that she was an inmate of the Jenkins' home from Nov. 3 to Dec. 20, 1911, and to the generally pleasant relations between the Jenkins, was inquired of on direct examination, as follows: "Q. Do you know what Mrs. Jenkins and Mr. Jenkins did with any old clothes while you were there? A. Yes, sir. Q. State what? By Mr. Rigdon, That question is objected to as incompetent and immaterial. Objection sustained. Defendant excepts." It is contended by defendant in his brief that this ruling was error because "the plaintiff advanced the theory that Mrs. Jenkins would not have burned any old clothes with the buttons on, but would have taken all buttons off before burning the clothes. The defendant offered to prove by this witness just how Mrs. Jenkins did dispose of old clothes and this should have been permitted." There was no offer to prove just how Mrs. Jenkins did dispose of old clothes other than that implied if at all in the question itself. Nothing was intimated or disclosed as to her habit with reference to the buttons which were a part of the garments, nor does the record disclose that the state advanced any such theory, although such theory might have been used in argument to the jury. The ruling was not error upon defendant's contention and no other is presented in the argument.

6. Wilfred O'Leary was called as a witness and testified in rebuttal for the state. He was permitted, over objection, to refresh his memory from the extension of a stenographic report of what the defendant said at a certain time and place, when the witness was present and heard all that the defendant said. He said that he saw and read the extension of the notes the day following, when the whole matter was fresh in his memory, and that the notes were the same and correctly and fully set forth what the defendant had said. The court upon this showing permitted

the witness to refresh his memory and refer to the notes in giving his testimony over the following objection, viz: "By Mr. Ross. I want to object to that upon the ground that this witness can not refresh his memory from notes made by somebody else. He will have to rely upon what he knows about it himself, and not rely upon Mr. Wilcox's testimony, and Mr. Wilcox's testimony is not sworn to, and nobody can testify to Mr. Wilcox's notes except himself." It will be observed that the witness was testifying from his own recollection upon refreshing his memory from these notes. It was not nor did the State present it as Mr. Wilcox's testimony, but it was the witness' evidence as to what the defendant said at the time and place. It is said at §758, Wigmore on Ev., that "Any writing may be used to stimulate and revive a recollection." The correctness of the notes was guaranteed by the witness (§747 id.) The trial court kept clearly within the rule in admitting the evidence and did not err in doing so. The further objection, if well taken, that this evidence was not proper rebuttal was a matter largely in the discretion of the court. The defendant neither requested to be permitted to reopen the case for the purpose of resisting this evidence nor does he show prejudicial error in admission of this testimony on rebuttal. The admissions tended to discredit the defendant's evidence given in chief.

7. G. A. Garrard was sworn and testified as a witness for the State as to the source and amount of property owned by the deceased. The defendant objected to this evidence on the ground that it was immaterial. In so far as the source of deceased's property is concerned such evidence may be deemed to have been immaterial and being so it was not prejudicial. Evidence of the amount of her property at the time defendant married her had a strong bearing upon and tended to show in connection with other evidence a motive upon his part to commit the homicide and was for that reason material.

8. There are sixty-four errors assigned to the rulings of the court in the admission, rejection and refusal to strike

out evidence over the objection or motion of the defendant. To discuss all of these questions would make this opinion unnecessarily long. We have, however, considered all of the questions and have selected as fair samples the foregoing assignments for discussion, and finding no substantial error in the other assignments deem it unnecessary to discuss them at length, except the assignment of error on the court's refusal to admit a base ball bat found sometime after and several blocks away from the scene of the homicide. It was the theory of the State that deceased came to her death by being struck on the right side of the head just above the ear with an Indian club, theretofore kept and found in the room, which crushed the skull and from which blow death occurred within a few seconds. The Indian club was produced in evidence. The defense offered evidence of a tough looking character being seen in the neighborhood the morning of the day of the homicide, and also offered in evidence the ball bat. Over objection the court rejected the ball bat as evidence and error is assigned on this ruling. There was no evidence connecting or tending to connect this club with the homicide. The evidence offered was merely speculative. No showing being made as to how it ever got to the place where it was found or its connection with the homicide, it was so lacking in relevancy as to entitle it to no consideration, and the court properly refused its admission.

9. Error is assigned on the overruling of the motion for a new trial on the alleged disqualification for cause of two of the jurors. The juror Van Zandt being examined on his *voir dire* said that he had formed at the time of the homicide from street talk and newspaper articles a "kind of opinion" as to the guilt or innocence of the accused and such articles and street talk had prejudiced him to a certain extent at the time; that he had no prejudice in the case at the time of his examination, but had an opinion to a certain extent and that it would be necessary to have the law and the evidence to change it. Upon the motion

for a new trial affidavits were filed setting forth a time and· place when and where it was claimed he had said prior to the trial that he would not have to sit as a juror on the Jenkins case for the reason that he had expressed an opinion. He was inquired of by the defendant as follows, viz: "If you should be selected as a juror now you would enter upon the discharge of your duties as a juror with this opinion in your mind and it would be necessary to have the law and the evidence to influence that opinion, would it not, change it?" Ans. "Yes, sir." Juror Norcross upon his *voir dire* testified that he had formed and expressed an opinion as to the guilt or innocence of the accused which would take evidence to remove. The defendant passed these jurors for cause and accepted them without using all of his peremptory challenges. We do not think the disclosure made by these jurors was in any wise misleading to the defendant. There was sufficient predicate for a challenge for cause or the exercise of a peremptory challenge. The rule is well settled that where the juror fairly states facts which would disqualify him for cause and a party fails to challenge the juror on that ground that party will be deemed to have taken chances and waived his right to thereafter question the qualifications of such juror. The party in so far as that quesion is concerned has had his day in court, and can not thereafter predicate error upon the evidence of a full and fair disclosure of the juror's attitude in the case, he having had the opportunity and having failed to challenge for cause at the proper time.

10. Alleged misconduct on the part of the prosecuting attorney is assigned as error in that exception was taken to the prosecuting attorney reading to the jury the following from the case of Commonwealth v. Webster, viz: "Perhaps strong circumstantial evidence in cases of crimes like this, committed for the most part in secret, is the most satisfactory of any form whence to draw the conclusion of guilt, for men may be seduced to perjury by many base motives to which the secret nature of the offense may afford a temp-

tation, but it can scarcely happen that many circumstances forming together the links of a transaction should all unfortunately concur to fix the presumption of guilt on an individual and yet such a conclusion be erroneous." We see no misconduct in the county and prosecuting attorney making use of such language from the opinion of the court in that case. Whether he read it from the book or not, it was argumentative and had reference to the reliability and weight of circumstantial evidence. There, as here, a conviction was sought on such evidence and the language used cannot be considered as an infringement upon the prerogative of the court to instruct or the juror's duty to take the law from the court as embodied in the instructions.

11. The court was authorized under the provisions of Section 6238, Comp. Stat. 1910, to permit the jury to view the place where the homicide occurred. That section is as follows: "Whenever, in the opinion of the court, it is proper for the jury to have a view of the place in which any material fact occurred, it may order them to be conducted in a body, under charge of the sheriff, to the place which shall be shown to them by some disinterested person appointed by the court; while the jury are thus absent, no person other than the sheriff, having them in charge and the person appointed to show them the place, shall speak to them on any subject connected with the trial." From the record it appears that the sheriff, over defendant's objection, was placed in charge of the jury for the purpose of conducting them to the premises. The objection was in the following language, viz: "By Mr. Ross. I object to any one making any statement or suggestions in the presence of the jury while they are viewing the premises where the killing occurred. I object to Mr. Roach especially making any statement or pointing out the premises to the jury for the reason that he is not an impartial or unprejudiced person, and for the further reason that he is not a disinterested person, and I object to any one at any time making any statement in the presence of the jury in regard to this

case, or unless it is also in the presence of the court. Objection overruled. Defendant excepts." It will be observed that the section above quoted clearly contemplates within the limitations therein expressed that the sheriff or the person appointed may speak to them on a subject connected with the trial in this case, to point out the premises and articles viewed. No showing was made of prejudice or bias on the part of the sheriff nor that he was an interested person in the result of the trial. The mere assertion that he was did not make him so without proof offered or received showing such fact. The following instruction to the sheriff appears in the bill of exceptions: "By the court. You may see that they see the whole premises; anything they desire to they may have the chance to do, but hold as little conversation with them as can be. Do not answer any questions that are asked you what the condition of affairs was at that time, or how they compare now with the time you were first there. Do not answer any questions of that kind, but just see that they have an opportunity to see everything and in general hold as little conversation as you can, and permit no one else to talk to them. Do not explain to them any difference between how things are now and what they were at that time, and point out to them any articles they ask especially to see. Give them ample time to see the whole premises that they want to. (Note) (The above is only part of the instructions given by the court to the sheriff before the jury were taken out to view the premises. Attorney Ross did not ask to have them reported until they were partially given)." While there was no request to have the instructions reported in full the part omitted by the reporter in substance, at least, could have been supplied. This was not done and it does not affirmatively appear that there was substantial error committed in the instructions given. Following the above instructions the following appears in the bill:

"By Mr. Ross. I want to ask that the stenographer be present to take down everything that is said so as to com-

plete the record. Request refused. Defendant .excepts."
The statute does not require the presence of a stenographer
with the jury upon viewing the premises. No evidence
is given there. The object of such view is to enable the
jury to reach a better and clearer understanding of the
evidence given in court and the situation as explained by
such evidence. It is presumed that the sheriff and other
person appointed by the court, both being under oath to
perform their duty, will follow the instructions of the court.
As against such presumption there is no showing in this
record either of bias, prejudice or interest on the part of
the sheriff or a violation of the court's instructions. That
no person other than the sheriff was appointed to show them
the place we think was not prejudicial in the absence of a
showing of misconduct on the part of the sheriff.

12. It is contended that the evidence does not support
the verdict. The evidence tends to show that defendant
was a carpenter by trade, thirty-three years of age, and
for some years prior and up to the time of the homicide
lived and worked at his trade in Cheyenne, Wyo. That he
met his wife through arrangements made by his cousin,
Dr. Hess of Denver, and thereafter and on June 19, 1911,
married her. The defendant testified that the Doctor wrote
him that "there is an awful nice girl down here that I want
you to meet and she has also got some property." Defend-
ant said: "I met the girl at the time. I said, I will go
down and meet the girl, but I said her money will be no
object to me." The doctor wrote him time and again about
the girl and in one letter the doctor said: "She was slow
and stupid and not your kind." That sometime before the
marriage, during a strike of the carpenters, defendant said
that he was to be married soon and would quit work after
he was married. That some time prior to his marriage he
showed a picture of his intended wife (the deceased) to
one of the witnesses for the state and said that he didn't
see how he could ever .learn to love her, because he didn't
like her shape or form and didn't see how he could marry

her, but his cousin seemed to want him to marry her on account of the money; he said she wasn't pretty and made further remarks about her form in language appearing in the record but too filthy for repetition here, and that after the marriage and two months prior to the death of deceased the defendant told the same witness that he had things fixed up so in case of her death he would get her money. Two or three days after the marriage, the latter having occurred less than a year before the homicide, defendant and deceased went to a lawyer who drew a will for her, in which she willed all her property to the defendant, which will she executed and which was shown to be in existence after the homicide and was introduced in evidence. Defendant said prior to the preliminary examination that he did not go with his wife to the lawyer's office to have the will drawn, but upon the trial admitted that he did go with her for that purpose. On the evening of the same day they came to Cheyenne, Wyo., where they rented a house in which they continued to live until Sunday, April 14, 1912, the day of the homicide. Defendant testified that they arose about 7 o'clock in the morning of that day and that he turned on the draft and replenished and banked the fire in the heating stove and built the fire in the kitchen stove. He didn't think there was any fire in the heating stove after nine o'clock in the forenoon, that it was unnecessary, for when the fire was built in the morning, he banked it up, which would do until evening. That his wife burnt the underclothes and overshirt which he claims to have taken off the night before and probably the trousers of an old brown suit of clothes, which were missing, in the heating stove between 9 and 10 o'clock that morning; that he did not know of any fire in the stove after he banked the fire as his wife was looking after the fire after that. That after breakfast he read the paper while she was doing up the work, then shaved, went down town and returned between twelve and one o'clock, had dinner at one o'clock, and after washing the dishes, he and his wife got a pillow and lay

down on a cushion on the floor in the sitting room and
went to sleep; about 3:30 o'clock in the afternoon · he
awakened,' left the house, and again went down into the
business portion of the city to see different parties who
were prospective buyers of motorcycles from a company of
which he was agent. He traced his movements, giving a de-
tailed statement of the different people he met, the time
when and where, the subject of the conversation and what
was said by himself and the different people he met, many
of whom were not prospective purchasers; went to a picture
show alone and remained a short time only and returned
to the house at 9 o'clock p. m., and found the house dark;
he went to the front door and opened it with his "dead
latch key" and entered the house, turned on the electric
light and discovered the dead body of his wife lying on
the floor in the dining rooom, where she had been sleeping
before he left her; the clothes from the bureau in the bed-
room scattered around and everything in disorder. Defend-
ant immediately left the house and went to the house of
Dr. Beard, who was the coroner, where he was observed
to be much agitated, looked and acted strange, talked in-
coherently, and asked that the doctor come at once to his
home that his wife was dead. The doctor took his automo-
bile and the two returned to the house; the sheriff was
notified and some of the neighbors called in. He testified
that he was not home between the time of leaving the house
at 3:30 p. m. and that his wife was alive and well and that
she accompanied him to and he kissed her good bye at
the side door when he left her. It was the theory of the
State that the defendant murdered his wife prior to the
time of his leaving the house; that is to say, prior to 3:30
in the afternoon, and that he wandered around the city
under pretense of wanting to sell motorcycles for the com-
pany of which he was agent, seeking prospective buyers, but
in reality for the purpose of manufacturing an alibi. He
contended that his wife was murdered after 3:30 p. m., the
time when he claims to have left her alive, and went down

to the city.   As already stated, the dead body was examined
by Dr. Beard at 9 o'clock in the evening and he testified
that she had been dead at least three hours, five or six
hours and possibly longer.   One witness testified to having
seen a man come out of the side door of the house into the
alley at 6:30 in the evening and that he (the witness) rec-
ognized this man as the defendant.   It is impossible here
to rehearse in detail the testimony.   It may be said in a
general way, that there was also evidence to the effect that,
after the homicide, blood was found spattered around the
room and on the ceiling; blood on the underwear and cloth-
ing of defendant and upon the towel in the bathroom; the
defendant testified that his wife burnt the clothing be-
tween 9 and 10 o'clock in the forenoon of the day of the
homicide.   These clothes of the defendant were missing
and could not be found and buttons were found on top
of cinders in the stove, formed by burnt clothing.   Aside
from the buttons hereinbefore referred to there were four
or five other buttons found in the stove, one of which was
a steel trouser button, and lying on the top of the firm
ashes defendant's pocket knife was found, showing the
effect of heat; there were blood stains on the sink in the
kitchen; blood stains in the bowl in the bathroom and on
the wall a rag was hanging with blood on it, where it had
dripped down; blood on the towel; the body of deceased
had not been outraged; a diamond ring, four other rings,
a pearl necklace, gold watch and pin on the bureau in the
bedroom and a pair of opera glasses and a gold chain on
the chiffonier lying in plain view in the same room; de-
ceased's eye glasses lying on the floor at her side; a trunk in
a closet in the bedroom about two-thirds pulled out with
the lid up and some papers scattered on the floor and in the
corner was an empty tin box; the cellar was examined and
no indications found of any one having entered the house
by way of the cellar; that the plaintiff was left handed and
that the fatal blow was received on the right side of the
head, and evidence that the blow must have been delivered

by some one facing her at the time, and hair and clotted blood on the Indian club found in the room. The evidence hereinbefore referred to in discussing the competency of the evidence in connection with the foregoing in our judgment supports the verdict. The question was peculiarly one for the jury whether the various circumstances detailed to them pointed so unerringly to the defendant as to remove all reasonable doubt from their minds as to his guilt.

13. The defendant requested, and the court refused to give the following instructions:

"The Court instructs the jury that the burden of proving the presence of the defendant at the time and place of the alleged murder devolves upon the State, and the State must prove beyond a reasonable doubt that he was present at the time of the alleged commission of the offense. It does not devolve upon the defendant to prove that he was not present, so that if, after a full and fair consideration of all the facts and circumstances in evidence or that adduced by the defendant, you have a reasonable doubt as to whether the defendant was at the place of the alleged crime at the time of its commission, or was at another place, you are bound to give the defendant the benefit of such doubt and acquit him." The instruction offered was, we think, fully covered by instructions 12, 13 and 14 and to which there was no objection. Those instructions are as follows, viz:

"Instruction No. 12. It is not the duty of the defendant to prove himself innocent, nor is it necessary that he should show who killed Jesse Root Jenkins. On the contrary, it is incumbent upon the State to prove beyond a reasonable doubt that the defendant was the person who did the killing; and unless the State has so shown by the evidence beyond a reasonable doubt, you must acquit the defendant.

"Instruction No. 13. It is the law that every one of these facts essential to the conclusion reached must be established to the same degree of certainty as the main fact. Also it is necessary that the proof should be not only consistent with the prisoner's guilt, but inconsistent with his innocence, for

if a single material circumstance remains unproven or if
proven, is inconsistent with the theory of guilt, the crime is
not proven with that certainty which the law requires and
which the law demands.

"Instruction No. 14. If from a consideration of all the
evidence in this case the jury entertains a reasonable doubt
as to whether the killing of Jessie Root Jenkins was done by
the defendant, or by some other person or persons without
the knowledge of the defendant, then it is the duty of the
jury to acquit the defendant."

By these instructions the question was fairly submitted to
the jury as to whether defendant was present at the time of
and committed the homicide. If he was present and com-
mitted the murder, then he was not somewhere else at that
time. In substance the instructions given were clearer and
stated the law of the case. If the jury found from the evi-
dence that defendant was present at his home and committed
the murder, then by the same measure of proof they found
that he was not somewhere else at that time. (State v.
Cameron, 40 Vt. 555.) It is unnecessary where there is
evidence tending to prove an alibi to submit such question
to the jury separately and apart from the main question, but,
on the contrary, the trend of the courts in the later decisions
is to submit the whole case to the jury in the absence of a
specific instruction on that subject. (State v. Ward, 61
Vt. 153, 17 Atl. 483.) Here the jury were told by another
instruction to consider all of the evidence in the case in
reaching their verdict and to give the defendant the benefit
of the doubt, if any, arising upon all the evidence. The in-
struction offered is also faulty in that if given the jury
would be told that such doubt might arise from a considera-
tion of all the evidence or from a consideration of that ad-
duced by defendant. We do not think this states the law,
for the verdict in a case must be predicated upon a consid-
eration of all the evidence which is submitted to the jury,
and not alone upon that adduced by the defendant. There
was no error in refusing to give this instruction.

14. Error is assigned upon the refusal of the court to give at the request of the defendant the following instruction to the jury, viz: "The jury are instructed that greater care should be exercised in weighing the testimony of witnesses, detectives and other persons especially employed to hunt up evidence against the defendant than in the case of witnesses who are wholly disinterested." This instruction has sometimes been given and approved in cases where the prosecution relies upon evidence furnished for pay or reward by a detective agency. In the case here no such evidence is relied on, and the record is wholly lacking in evidence tending to show that any informers, detectives or other persons especially employed to hunt up evidence testified in the case. The court very properly refused to give such an instruction.

The jury were instructed correctly upon circumstantial evidence and as to the law of the case. The case was carefully tried and the learned judge who presided at the trial should be commended for his care in preserving the defendant's rights both as to his rulings and the full and complete instructions which he gave to the jury which set forth with clearness and conciseness the law of the case and which need no further comment. We have considered all the errors assigned, though we have not referred to each individual assignment by itself, except as hereinbefore discussed, and find no prejudicial error in the record. There was sufficient evidence to support the verdict. We are of the opinion that the judgment should and the same will be affirmed.

And now this court appoints Friday, the 14th day of November, in the year of our Lord 1913, for the execution of the sentence pronounced by the court below.

*Affirmed.*

POTTER, J., and BEARD, J., concur.

### ON PETITION FOR REHEARING.

SCOTT, CHIEF JUSTICE.

The plaintiff in error has filed an application for a rehearing. He urges that the question of the admissibility

of the club discussed in the opinion was neither raised nor assigned as error and further that the club was admitted and received in evidence without objection. An examination of the record shows that this contention is correct. The writer speaking for himself desires to assume all responsibility for the oversight, he being under the impression from the oral argument that the club was rejected when offered in evidence. It seems, however, upon the record, that the plaintiff in error had the full benefit of the evidence and what we said with reference thereto was dictum as not being based upon any question raised upon the record. It is apparent that the plaintiff in error was not prejudiced by what we said and we seize the opportunity to correct our opinion in this respect, which is accordingly done.

The alleged misconduct of the county and prosecuting attorney is here urged as a ground for a rehearing. The 85th assignment of error is the only one contained in the motion for a new trial touching that question, and is as follows: "That there was misconduct, on the trial of said cause, on the part of the prosecuting attorney, prejudicial to the defendant in that he read a passage taken from a law book in making his closing argument to the jury. To the reading of which passage the defendant at the time objected and excepted. Said statement so read is more fully shown by the affidavit hereto attached, marked Exhibit A." That exhibit is as follows:

"The State of Wyoming,⎫
　　County of Laramie,　⎬ ss.

Ethel A. Carpenter, being first duly sworn, according to law, upon her oath deposes and says that she was present at the trial of the case of The State of Wyoming vs. J. Warren Jenkins, and took down in shorthand the testimony given in said trial, and also part of the first argument of Charles L. Rigdon, Esq., counsel for the State, and the last argument of the said Charles L. Rigdon; that Charles L. Rigdon, in his closing argument, made the following state-

·ment to the jury: 'I hope I may be pardoned for reading one very small fact. It is this, taken from............... Commonwealth vs. Webster.' And then the said Charles L. Rigdon read from a paper the following:

"Perhaps strong circumstantial evidence in cases of crimes like this, committed for the most part in secret, is the most satisfactory of any form whence to draw the conclusion of guilt, for men may be seduced to perjury by many base motives to which the secret nature of the offense may afford a temptation, but it can scarcely happen that many circumstances forming together the links of a transaction should all unfortunately concur to fix the presumption of guilt on an individual and yet such a conclusion be erroneous." That at the time the defendant objected to the said Charles L. Rigdon reading said passage, and that the Court, over the objection of the defendant, permitted the said Charles L. Rigdon to read said passage. To which ruling of the Court the defendant at the time excepted.

(Signed) ETHEL A. CARPENTER.

Subscribed in my presence and sworn to before me this 2nd day of August, A. D. 1912.

(SEAL)          (Signed) CLYDE M. WATTS,
                                    Notary Public."

The objection and exception do not appear in the bill of exceptions independent of this *ex parte* affidavit which was filed in support of the motion for a new trial. The bill does not state, nor does the judge who signed the bill certify that any objection was made at the time to the alleged misconduct of the county attorney, or that any ruling was made thereon, or any exception taken thereto at the time. The court or judge in signing the bill of exceptions certifies that the statements contained in the bill are true and that the objections, rulings and exceptions therein stated occurred on the trial; but he does not certify that the statements contained in an affidavit attached to a motion for a new trial are true or that the matters therein stated occurred on the trial. What occurred on the trial must appear

by the bill and not by *ex parte* affidavits. (2 Ency. Pl. & Pr., 756-758; Wallace v. Skinner, 15 Wyo. 233, 261, 88 Pac. 221; Robb v. State, 144 Ind. 569, 43 N. E. 642; State v. Helm, 97 Ia. 378, 387, 66 N. W. 751; Alexander v. Menefee (Ky. 1901) 64 S. W. 855; Hacker v. Heiney, 111 Wis. 313, 320, 87 N. W. 249; Morris v. Whyte, 158 Mo. 20, 57 S. W. 1037). Notwithstanding the failure to properly present the question by the bill it was discussed in the opinion and we need not further refer to it. Much of plaintiff's brief in support of his petition is devoted to the question of alleged misconduct of counsel in other respects but this was not made a ground in the motion for a new trial. It is urged among other grounds for a rehearing that

"1 The trial court refused to permit a record of the statements made to the jury while viewing the premises to be kept by the official stenographer."

"2. The judge failed to accompany the jury while viewing the premises."

"3. The record does not show that the defendant was present at the view. The record shows that the stenographer failed to take down all of the instructions given to the jury before going to view the premises."

These questions with the exception of the second, which was not raised in plaintiff in error's brief nor in argument, were discussed in the opinion. The view authorized and permitted by the statute is by the jury upon order of the court. The view is not by the court and it seems almost a waste of words to say that the judge was not required to accompany the jury upon its view to the place where the homicide was committed.

The record is silent as to whether the defendant was present at the view, but we do not think that for that reason he was deprived of a constitutional right and was therefore entitled to a new trial. This was not assigned as a ground in the motion for a new trial but even had it been so assigned it was a right which the defendant could have waived (2 Bish. New Cr. Proc., §965, sub-division 3) and

in the absence of a request of the court that the defendant be permitted to accompany the jury and a denial by the court he will be deemed to have waived such right. (Elias v. Terr. 9 Ariz. 1, 76 Pac. 605, 11 Ann. Cas. 1153; State v. McGinnis, 12 Idaho 336, 85 Pac. 1089; People v. Thom. 50 N. E. 947, 156 N. Y. 286, 42 L. R. A. 368; Commonwealth v. Van Horn, 41 Atl. 469, 188 Pa. St. 143; State v. Mortensen, 73 Pac. 562, 26 Utah, 312).

It is contended as in the original brief that the court erred in not permitting the defendant to cross-examine Dr. Beard as to whether he had stated "Later, however, Roach claims to have found I think, a towel in some place, but I am not sure whether that was with the clothing they gave to me to examine or not, I think it was. There was just a few stains of blood on it, not sufficient to have made a test of, however, just little stains. State whether or not you made that statement to me?" This question was discussed in the opinion. It was not pointed out in the brief what statement made by the witness in his evidence would conflict with this statement, although defendant's counsel now say: "If the court will but read the testimony of Dr. Beard upon his redirect examination by the prosecuting attorney, it will find that this witness was minutely examined as to the statements which he made in the office of Mr. Ross and was asked whether or not this statement was contradictory of what he had testified to on direct examination." We have read the redirect examination of the witness, all of which was made after the ruling complained of and without objection or exception by defendant. The defendant complains that the ruling upon this objection is not in harmony with that made by the court in overruling a similar objection made by defendant to the evidence offered by the prosecuting attorney in laying the foundation for the impeachment of the witnesses Brennan and Stapleton. The rule is elementary that the foundation must be laid for the impeachment of the witness upon a material and not a collateral fact. The fact was not what the witness said that

he, Roach, claimed or said to the witness except for the
impeachment of Roach (and for which no foundation was
laid) but *when* and *where* he, Roach, found the towel which
the Doctor examined for blood spots. Proof of when and
where he found the towel was competent from the lips
of Roach who was a witness in the case and no contradic-
tory statements by him are pointed out or foundation laid
for his impeachment.

We do not, as stated in the opinion filed, deem it nec-
essary to discuss the other alleged errors. Some of those
not discussed raise but elementary questions or involve the
application of rules of evidence in their simplest form and
some of them are based upon no objection or exception
taken at the time. We have been patient and we think
painstaking in the consideration of the case. This court
is ever ready to correct an error into which it may have
fallen. The unfortunate defendant has had a trial, the
record of which has been presented and here reviewed in
the light of the assistance of his able counsel but we can
see no reason for changing our conclusions upon the whole
record as announced in our former opinion.

In pronouncing judgment the court below sentenced the
defendant to suffer the penalty of death as provided by
law for murder in the first degree, and imposed a fine of
$1,000, and rendered judgment therefor and for costs in
favor of Laramie county and directed that execution issue
therefor. The fine was authorized under section 6256,
Comp. Stat. 1910, which is as follows: "The minimum
term of imprisonment in the penitentiary shall in no case
be less than one year; and the court, in its discretion may
impose a fine of not more than one thousand dollars as a
part of the punishment for any felony." It does not appear
that any application was made to the court below to modify
the judgment with respect to imposing the fine or awarding
costs nor do we think the third assignment of error raises
either of these questions. That assignment is as follows:
"3. Because the judgment of the court in imposing sen-

tence upon the plaintiff in error upon the verdict of the jury is contrary to law." We may say, however, that it was not permissible at common law to render judgment for costs against a defendant in a felony but such costs may be taxed when expressly authorized by statute and which statutes are uniformly held to be constitutional. (11 Cyc. 267, 268). It is provided by Sec. 6034, Comp. Stat., 1910, that in all cases of a conviction of an offense, the court . shall render judgment against the defendant for the costs of prosecution. As to the fine, it was authorized by the statute and its imposition within the limits authorized was discretionary with the court. It was suggested in the brief that the judgment provided cruel and unusual punishment. The statute applies uniformly throughout the state to all in like condition as the defendant and the punishment provided does not fall within any class forbidden by the constitution as cruel or unusual, but as commensurate with the crime of which defendant was found guilty. The legal punishment consists of two separate and distinct things and the imposition of the fine in addition to the death penalty was not cruel nor unusual. Fine and imprisonment as to other felonies is uniformly upheld. (Page 408 Cooley's Const. Lim.). We see no reason why the imposition of the fine was not proper, for homicide of whatever degree is a felony as defined by Section 6029, Comp. Stat. id., which is as follows: "Offenses which may be punished by death, or by imprisonment in the penitentiary, are felonies; all other offenses are misdemeanors." We see no reason why the fine should not be imposed as a part of the punishment and the costs taxed as provided by the statute. A rehearing is denied.

*Rehearing denied.*

POTTER, J., and BEARD, J., concur.